

Opinions of the United
States Court of Appeals
for the Third Circuit

1-13-1998

# Newark NAACP v. City of Bayonne

Precedential or Non-Precedential:

Docket 96-5848

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation
"Newark NAACP v. City of Bayonne" (1998). *1998 Decisions.* Paper 8.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/8

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 13, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5848

NEWARK BRANCH, NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE; JERSEY CITY
BRANCH, NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE; NEW JERSEY
STATE CONFERENCE, NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED PEOPLE; THE
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE,
      Appellants

v.

CITY OF BAYONNE, NEW JERSEY

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 90-cv-00684)

Argued July 22, 1997

Before: SCIRICA, ROTH and WEIS, Circuit Judges

(Filed January 13, 1998)

JOSHUA N. ROSE, ESQUIRE
 (ARGUED)
DAVID L. ROSE, ESQUIRE
Rose & Rose, P.C.
1835 K Street, N.W., Suite 900
Washington, D.C. 20006-1203

JONATHAN M. HYMAN, ESQUIRE
Rutgers University School of Law
Constitutional Litigation Clinic
15 Washington Street, Room 338
Newark, New Jersey 07102

 Attorneys for Appellants

TARQUIN J. BROMLEY, ESQUIRE
 (ARGUED)
Apruzzese, McDermott, Mastro &
 Murphy
25 Independence Boulevard
P.O. Box 112
Liberty Corner, New Jersey 07938

 Attorney for Appellee

OPINION OF THE COURT

SCIRICA, Circuit Judge.

This Title VII case involves an interpretation of a consent order that removed a residency requirement for municipal employees.

In 1989, the National Association for the Advancement of Colored People, its New Jersey State Conference, and its Newark and Jersey City Branches, filed suit in district court against the City of Bayonne, New Jersey. The NAACP alleged, inter alia, that Bayonne unlawfully discriminated in hiring municipal employees, principally police officers and firefighters, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. SS 2000e-2000e-17 (West 1994 & Supp. 1997) by requiring its employees to reside in Bayonne.

Bayonne is a "civil service" municipality 1 and hires
_____

1. Pursuant to N.J. Stat. Ann. SS 11A:9-1 and 11A:9-2, a New Jersey municipality can choose whether or not it wants to be subject to the

2

employees for competitive positions (police andfirefighters) on the basis of their performance on a state-wide civil service examination administered by the New Jersey Department of Personnel.2 Applicants for non-competitive positions are not hired on the basis of their performance on an examination.

On January 31, 1991, the parties entered into a stipulation and order settling the lawsuit. Bayonne agreed to suspend its residency requirement and to affirmatively recruit African American applicants. The stipulation expired in four years, but Bayonne remained under a continuing obligation to ensure that its recruitment and hiring practices were lawful and nondiscriminatory.

Four years later, in May 1995, because the removal of the residency requirement failed to increase--and in the case of police officers decreased--the representation of African Americans among its workforce, Bayonne reinstated the residency requirement. The NAACP sought injunctive relief. In a bench trial, the district judge denied the request for injunctive relief, finding the NAACP failed to establish a causal nexus between the residency requirement and its allegedly disparate impact on African Americans. The NAACP now appeals.3

We hold the district court was not clearly erroneous in concluding the NAACP failed to prove the residency requirement unlawfully discriminated against African American applicants for police and firefighter positions. But the district court made no finding with respect to Bayonne's hiring for non-competitive jobs, which do not require a civil service examination. We will affirm in part and reverse in part.

_____

state's Civil Service Act.

2. The NAACP has not made the New Jersey Department of Personnel a party to this lawsuit and is not challenging the legality of the examination.

3. The Honorable H. Lee Sarokin presided over this matter in 1991. After Judge Sarokin was appointed to this court, the matter was assigned to the Honorable William H. Walls, United States District Judge for the District of New Jersey.

I.

Bayonne[4] hires its municipal employees in accordance
with New Jersey's Civil Service Act, N.J. Stat. Ann. S 11A:1-
1 et seq. (West 1993 & Supp. 1996). New Jersey has two
divisions of civil service jobs: competitive and non-
competitive. N.J. Stat. Ann. S 11A:3-2 (West 1993). Civil
service regulations require that candidates for competitive
positions, including police and fire-department jobs, apply
through the New Jersey Department of Personnel. For these
jobs, the New Jersey Department of Personnel administers
examinations and promulgates a list of eligible candidates
based on the results of the examination. N.J.A.C.S 4A:4-1.1
(1995); S 4A:4-4.2 (1995). The New Jersey Department of
Personnel ranks the candidates on the list, called a
certification, in order of their test scores. N.J. Stat. Ann.
S 11A:4-1 (West 1993); N.J.A.C. S 4A:4-3.2 (1997). When
Bayonne wants to hire workers for competitive positions, it
requests a list of a number of candidates sufficient to
satisfy its hiring needs. N.J.A.C. S 4A:4-4.1 (1996). The New
Jersey Department of Personnel then selects an appropriate
number of candidates from the master list in accordance
with the residence requirements of Bayonne and forwards
the certification to Bayonne. N.J.A.C. S 4A:4-3.2. After
receiving the certification, the municipality-- for the first
time in the process -- learns the names, addresses and
rank of eligible candidates. At the same time, the New
Jersey Department of Personnel notifies eligible candidates
they have been certified and instructs them to inform
Bayonne if they are interested in the job. N.J.A.C. S 4A:4-
4.2(b). If a candidate indicates his or her interest, Bayonne
commences its own screening process to ensure that the
candidate meets the age, citizenship, health and character
standards established by state law and is otherwise suited
to serve.[5] Otherwise, with limited exceptions not applicable

_____

4. Bayonne is located in the southern end of Hudson County, New
Jersey, bordered on the north by Jersey City. Newark lies ten miles
away. African Americans make up 4.7% of Bayonne's population. African
Americans make up 14.4% of the population of Hudson County and
40.6% of neighboring Essex County.

5. Candidates for the police and fire departments must also submit to a
drug test, a thorough background check, a physical examination, and an
interview with the chief of the police or fire department.

here, Bayonne must hire the candidates in the exact rank order presented by the New Jersey Department of Personnel. N.J.A.C. S 4A:4-4.8 (1996).

Candidates for non-competitive entry level positions, such as laborer and clerk typist, are hired directly by Bayonne. Most electrical and blue collar positions are promoted from the laborer and clerk typist level. Certain non-promotional, non-uniform positions are classified as open competitive and are filled from certified lists created by the New Jersey Department of Personnel. Many of these jobs traditionally have been filled on a provisional basis while the New Jersey Department of Personnel posts the vacancies and certifies a list of eligible candidates based on examinations. Frequently, although not always, the provisional appointee is appointed on a permanent basis. See J.A. at 1.27.

Before 1991, Bayonne limited its municipal hiring to Bayonne residents only, an option permitted by the Civil Service Act. See N.J. Stat. Ann. S 40A:9-1.3 (1993) (Municipalities may "require [that] . . . all officers and employees employed by the local unit . . . be bonafide residents therein.").

As we have noted, on February 20, 1990, the NAACPfiled suit in the United States District Court for the District of New Jersey against Bayonne, asserting its residency requirement unlawfully discriminated against African Americans in violation of Title VII. Before trial, the parties settled the case by entering into the stipulation. The stipulation provided that Bayonne "shall not engage in any employment practice which unlawfully discriminates against individuals on the basis of their race in recruitment or hiring or in other terms and conditions of employment." J.A. at 2.5. The stipulation articulated its purpose: "to ensure that the recruitment and hiring practices of Bayonne are lawful and non-discriminatory, and to ensure that no one is unlawfully disadvantaged by its recruitment and hiring practices." Id.

Under the stipulation, Bayonne, without admitting wrongdoing, promised to: (1) replace its "Bayonne-residency" requirement with a "New Jersey-residency"

requirement for police officers and fire-fighters;6 (2) affirmatively recruit African American applicants; and (3) refrain from discriminatory employment practices in the future. Recruitment efforts included "paid radio and newspaper advertising and outreach in Newark, East Orange, and Jersey City, with the goal of attracting black applicants in numbers reflecting their availability in the job category being filled." J.A. at 2.5-2.16.

Bayonne remained under a continuing obligation to refrain from discriminatory recruiting and hiring practices. The stipulation provided that "[a]t the conclusion of four (4) years from the date this Stipulation is executed . .. the requirements of this Stipulation shall cease to bind [Bayonne] . . . except that [Bayonne] . . . shall continue to ensure that the recruitment and hiring practices of Bayonne are lawful and non-discriminatory." J.A. at 2.16. In the event of Bayonne's non-compliance, the NAACP could enforce the stipulation upon "a clear and convincing showing that defendant's failures or omissions to meet the terms of this stipulation were not minimal or isolated but were substantial." J.A. at 2.14. During the four-year term, the NAACP never availed itself of this provision.

On March 8, 1991, Bayonne amended its residency ordinance in accordance with the terms of the stipulation. Bayonne also increased recruitment efforts aimed at African Americans. The record demonstrates that the Bayonne Police Department engaged in an extensive program to recruit Bayonne residents for the civil service examination which included outreach to African Americans living in Bayonne. In addition, the Deputy Chief of the fire department led an intensive effort to recruit and train Bayonne residents, particularly African Americans, for firefighter jobs. J.A. at 1.11-1.12, 1.35.

It is uncontested, however, that after four years, minority representation did not increase. Significantly, as the NAACP stated both in the district court and in oral argument before this court, minority representation among police

_____

6. For other positions, the stipulation provided that Bayonne merely had to relax its residency requirement. Non-residents who took municipal jobs had to move into Bayonne within six months of their employment.

officers actually decreased. The record demonstrates that the number of African American candidates referred by the Department of Personnel to Bayonne for police positions decreased from 3.4% to 1% during the moratorium.7

On May 3, 1995, "having concluded that the stipulated settlement with appellants did not increase the number of the City's black employees," Bayonne reenacted its residency requirement.8 Brief of Appellee at 13. As noted, on May 9, 1996, the NAACP asked for temporary and permanent injunctive relief, claiming Bayonne's reinstatement of the residency requirement violated the stipulation's prohibition against future employment discrimination.

The district court reopened the case and on July 8, 1996, denied the NAACP's application for a preliminary injunction. Subsequently, in November 1996, the district court conducted a bench trial. The parties submitted extensive stipulations of fact, and the NAACP presented witness testimony. Much of the NAACP's evidence was statistical, including the following:9

> – Bayonne is approximately 4.7% African American. Hudson County is approximately 14.4% African American, and neighboring Essex County is approximately 40.6% African American.
>
> – Of the employees hired during the four-year moratorium, 2.6% of the non-residents were African

_____

7. We cannot make a similar comparison for firefighters because the parties have not provided us with statistics on Bayonne's hiring before the residency requirement was lifted. The parties' joint appendix does tell us from 1992-1995, 97 persons were certified to Bayonne as eligible for employment as firefighters. Bayonne rejected one, 3 declined appointment, 10 failed to respond to the notice of certification, and 9 asked to be deferred for later consideration. Of the 81 hired, 2 (2.5%) were African American. J.A. at 1.22-1.23.

8. The residency requirement became effective May 24, 1995.

9. These statistics were compiled in various years. We specify the years only when relevant.

7

American, and 5.5% of the Bayonne residents were African American.10

– During the four-year moratorium, the percentage of newly-hired police officers who were African American decreased. In February 1990, 3.4% (5 of 145) of those listed as eligible for police employment were African American, and 20% (2 of 10) of those hired were African American. In comparison, in January 1992, 8.2% (77 of 933) of those listed as eligible for police employment were African American, and 1.1% (4 of 362) of those certified for hiring were African American. After the moratorium expired, in September 1996, 6.6% of newly-hired police officers were African American.

– In Bayonne, 14.3% of employees of large, private-sector employers are African American. In Hudson County, 17.2% of employees of large, private-sector employers are African American.11

– 11.1% of New Jersey's civilian labor force is African American. 21.2% of New Jersey's government employees are African American.

The NAACP also offered expert witness David Griffin, who analyzed statistics, compared the racial composition of Bayonne with both the surrounding counties and the entire State of New Jersey, and opined that the residency requirement was discriminatory.

After hearing the NAACP's evidence, the district court granted Bayonne's Motion for Judgment under Fed. R. Civ. P. 52(c).12 The court found the NAACP failed to prove a

_____

10. African American representation in Bayonne's municipal workforce was 3.5% before the four-year moratorium. The NAACP contends during the four-year moratorium, 5% of the municipal employees hired were African American. J.A. at 1.13-1.14. But the NAACP does not use this statistic in its briefs in support of its prima facie case. And at trial, the
NAACP's expert stated that he "would be surprised if that [difference] was statistically significant." J.A. at 1.207.

11. The parties obtained these numbers from reports of the Equal Employment Opportunity Commission on the racial composition of private employer establishments with over 100 employees.

12. Fed. R. Civ. P. 52(c) provides, in relevant part: "If during a trial without a jury a party has been fully heard on an issue and the court

causal nexus between Bayonne's residency requirement and the low percentage of African American municipal employees. The district judge ruled orally:

> I am constrained to dismiss this case because there is no factual basis for what we have had by way of opinions given by the plaintiff's expert, David Griffin, an expert in labor market analysis.
>
> As I discussed with [plaintiff's counsel] Mr. Rose and I incorporate by reference, we have an order entered January 31, 1991 by the then District Judge Sarokin approving and incorporating therein a stipulation by the parties. Originally the Newark Branch of the NAACP, together with other branches of the organization had brought suit against the City of Bayonne alleging and claiming that under Title VII, that the members of the plaintiff and members of the black race in general had been discriminated against in employment by the municipality of Bayonne.
>
> The stipulation sought to resolve the differences by the parties and between the parties by providing that a residency requirement, which had been the main thrust of the complaint by the plaintiffs against the defendant, would be removed, and it was so done in, I believe, March 1991.
>
> Thereafter, for the life of the stipulation, which was four years from the date of execution by Judge Sarokin, there was no such residency requirement. During that period, the hope for an increase in black municipal government employment, it is agreed, did not improve.
>
> It should be also noted that during this period there has been no history, through the plaintiffs anyway in their case, of there being any complaint by the plaintiffs of any failure of the defendant municipality to

_____

finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue...."

abide by the terms of the stipulation, although there was a mechanism for such overview and review with the Court having jurisdiction retained to it to entertain any criticisms of what was being done or not being done by Bayonne.

In any event, we have had for the last day and a half evidence produced by David Griffin primarily which consists, with all due respect, of statistical possibilities relying upon data wherein he assumes that Hudson County is the employment market by which comparisons shall be made as to whether blacks are being disparately impacted by the residency ordinance that was recently reinstated by the municipality of Bayonne in the spring of this year, 1996.

With due respect to the doctor, his opinions, as he admits in one circumstance, are nothing more than his expression of common sense. They are speculative. They involve speculative contingencies and possibilities without any evidential basis. I can't be more specific because he was not more specific.

He speaks about the failure of blacks to be hired, but there is no evidence as to why they were not hired. He speaks of the non-seeking of employment with Bayonne by blacks and being much lower than that in surrounding Hudson County towns, but we have no evidence as to why that is. And regardless of how important and how vital the purpose of Title VII is, it, too, just like any other law is dependent upon factual evidence from which judges and lawyers and parties can make meaningful decisions. That is the problem with this case, we have no factual evidence.

We have well intentioned statistical platitudes. For example, much is made of a 1996 police employment examination, which has a small number of persons of, as I said, the black race, as being qualified, but that list was not prepared nor administered, nor reviewed by the defendant in the municipality. It was prepared by the New Jersey State Department of Personnel, so to try to speak of visiting discrimination, whether intentionally or inadvertently or institutionally, at the

10

> doorstep of the municipality is not warranted factually,
> and that is why I dismiss this case, because there is
> nothing to support it factually.

J.A. at 1.251-1.255. The NAACP now appeals.

II.

The district court had jurisdiction under 28 U.S.C.
SS 1331 and 1343 (1993) because this case arises under
Title VII, and we have jurisdiction under 28 U.S.C. S 1291
(1993).

The district court found the NAACP failed to meet the
burden imposed by the stipulation of demonstrating non-
compliance because it did not prove the residency
requirement caused a disparate impact in hiring. Causation
presents a question of fact. Kachmar v. Sungard Data Sys.
Inc., 109 F.3d 173, 179 (3d Cir. 1997); Thomas v. City of
Omaha, 63 F.3d 763, 765 (8th Cir. 1995) (reviewing Title
VII causation determination as a finding of fact).

Federal Rule of Civil Procedure 52(a) dictates the
appropriate standard of review. In a bench trial, the court
"shall find the facts and state separately its conclusions of
law thereon" and those "[f]indings of fact... shall not be set
aside unless clearly erroneous." Id. The NAACP requests
application of a plenary standard of review. But the
applicable authority holds that the district court's findings
of intentional discrimination or disparate impact shall be
reviewed under the clearly erroneous standard. See
Anderson v. City of Bessemer City, 470 U.S. 564, 566
(1985) ("In Pullman Standard v. Swint, 456 U.S. 273 (1982),
we held that a district court's finding of discriminatory
intent in an action brought under Title VII . . . is a factual
finding that may be overturned on appeal only if it is clearly
erroneous."); Villanueva v. Carere, 85 F.3d 481, 485-86
(10th Cir. 1996) ("[W]e may reverse the trial court's finding
of no discriminatory intent only if it is clearly erroneous
. . . . [T]his standard of review [is] well established.");
Bernard v. Gulf Oil Corp., 890 F.2d 735, 739 (5th Cir. 1989)
("The standard of review for such a decision is whether,
looking at the record as a whole, the district court was
clearly erroneous in its determination that there was no

11

purposeful discrimination and that the action resulting in disparate impact was justified by legitimate business reasons.") (citation omitted); Keyes v. Secretary of the Navy, 853 F.2d 1016, 1019 (1st Cir. 1988) ("A district court's finding concerning intent in an employment discrimination action is a factual finding within the `clearly erroneous' rubric.") (citation omitted); Chambers v. Omaha Girls Club, Inc., 834 F.2d 697, 702 (8th Cir. 1987) (citation omitted).

Of course, this case lies one step removed from a traditional Title VII analysis. The district court evaluated whether Bayonne fulfilled its obligations under the stipulation to refrain from employment practices that violated Title VII. Focusing on Bayonne's performance under the stipulation, the district court assessed whether Bayonne complied and made factual findings. We review factual findings for clear error.

Harrison v. Metro. Gov't of Nashville and Davidson County, 80 F.3d 1107 (6th Cir. 1996), cert. denied, 117 S. Ct. 169 (1996) supports this standard of review. In Harrison, a discharged public employee filed a contempt citation against his former government employer, alleging it failed to comply with a stipulation resulting from race discrimination litigation. The United States Court of Appeals for the Sixth Circuit applied the following standard of review when examining the district court's finding of contempt:

> In order to hold the defendants in civil contempt, a district court must find that the plaintiff established by clear and convincing evidence that the defendants violated the court's prior order. In fact, eachfinding of a violation of the order must be supported by clear and convincing evidence. . . . We review the district court's finding of civil contempt for an abuse of discretion. A district court may abuse its discretion when it relies on clearly erroneous findings of fact.

Id. at 1112-13 (citations omitted).

Accordingly, we review for clear error.

> Under this standard, a finding is `clearly erroneous when the reviewing court on the entire evidence is left

with the definite and firm conviction that a mistake has been committed.' This standard does not permit the reviewing court to conduct a de novo review of the evidence, but it does allow the court to consider whether there is enough evidence in the record to support the factual findings of the district court. This review is more deferential with respect to determinations about the credibility of witnesses, and when the district court's decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error.

United States v. Igbonwa, 120 F.3d 437, 440-41 (3d Cir. 1997) (citations omitted), petition for cert. filed (Oct. 23, 1997) (No. 97-6518).13

III.

We must "examine the language of the [stipulation] to determine the obligations and duties undertaken by the various parties." Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Serv., 832 F.2d 811, 814 (3d Cir. 1987). The language of the stipulation is clear: Bayonne "shall continue to ensure that the recruitment and hiring practices of Bayonne are lawful and non-discriminatory." The parties agree this clause requires Bayonne to comply with Title VII, 42 U.S.C. S 2000e-2(a), which makes it unlawful to "limit . . . applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race . . . ." Title VII prohibits not only intentional discrimination, but also "disparate impact" discrimination, i.e., "employment practices, adopted without a deliberately discriminatory motive, [which] may in operation be functionally equivalent to intentional

_____

13. The NAACP maintains the district court failed to make the requisite findings of fact. Under Robinson v. Lehman, 771 F.2d 772 (3d Cir. 1985), the district court must set forth findings of fact sufficient to allow "the appellate court, on review, [to] ascertain the basis for [its] decision." Id. at 780. Except with respect to Bayonne's hiring of non-competitive employees, the district court satisfied this requirement.

13

discrimination." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987 (1988).

In order to establish a prima facie case of disparate impact discrimination, the plaintiff must demonstrate that application of a facially neutral standard has caused a "significantly discriminatory hiring pattern." Newark Branch, NAACP v. Town of Harrison, 940 F.2d 792, 798 (3d Cir. 1991). See also Wards Cove Packing Co., Inc. v. Antonio, 490 U.S. 642, 657 (1989) (holding plaintiffs must "demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites."). The evidence in these cases usually focuses on statistical disparities. Harrison, 940 F.2d at 798. 14

To prove causation through statistical evidence alone, the statistics must be "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. . . . [S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation." Watson, 487 U.S. at 994–95. See also McNeil v. McDonoush, 648 F.2d 178, 182 (3d Cir. 1981) (causation will be proven only if the statistics do not require speculation by the court). The Supreme Court has emphasized that the statistics must be relevant to the discrimination alleged. See Hazelwood School Dist. v. United States, 433 U.S. 299, 313 n.20 (1977). "The`proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified . . . population in the relevant labor market.' " Wards Cove, 490 U.S. at 650–51 (citations omitted).

_____

14. Once the plaintiff proves its prima facie case, the burden shifts to the defendant to prove a business justification for the challenged practice. It is then up to the plaintiff to discredit any business justification asserted (or to suggest a viable alternative to the challenged practice which would reduce the disparate impact). Harrison, 940 F.2d at 798. Burden shifting never occurred in this case, because the court held plaintiff failed to prove its prima facie case.

The district court found the statistical evidence offered by the NAACP was insufficient to prove causation. 15 Specifically, it held the NAACP did not prove the residency requirement discriminated against African Americans. At oral argument the NAACP conceded the New Jersey civil service examination was a likely cause of the disparity.16 As the Court of Appeals for the Fifth Circuit held in considering a challenge to an employment test:

> The plaintiffs contend that th[e] disparity results both from testing and the use of subjective criteria, yet they offer no method from which this Court can ascertain whether a significant part of this disparity results from testing. The plaintiffs simply have not shown that testing, independent of other factors that may affect the racial balance of the workforce, is causally related to discrimination in the number of blacks hired or promoted. The causal requirement recognizes that under representation of blacks might result from any number of factors, and it places an initial burden on the plaintiff to show that the specific factor challenged under the disparate impact model results in the discriminatory impact. The plaintiffs, by failing to isolate the discriminatory effect of the practice they challenged, did not meet this burden.

Carroll v. Sears, Roebuck & Co., 708 F.2d 183, 189-90 (5th Cir. 1983).

The NAACP contends it has proven causation. Although its position is not entirely clear, it seems to make two separate arguments. First, the NAACP argues the residency requirement reduces the percentage of African Americans on the list of eligible candidates. Responding to the district court's request to produce its best evidence, counsel for the NAACP said: "If [Bayonne has] the residency requirement

_____

15. The NAACP contends the district court improperly held statistics are an improper form of evidence. We disagree. The district court held that the statistics in this case were insufficient, and expressed no opinion whether they constituted "proper" evidence.

16. Counsel for the NAACP acknowledged, "Clearly the test has a disparate impact, no question about it." The NAACP argues that although the test is one cause, the residency requirement is another.

15

they hire from the 6 percent black list. If they don't have the residency requirement, they might hire from an 11 percent black list or 15 percent black list." 17 J.A. at 1.238. By referring to the "list," the NAACP apparently means the list of applicants who took and received a passing grade on the law enforcement examination administered by the New Jersey Department of Personnel in January 1996. 18

But this argument ignores the process by which Bayonne selects police officers. That 15% or 30% of those taking and passing the test are African American bears little relationship to the racial composition of the list of candidates ultimately certified to Bayonne. Except for the residency requirement, Bayonne does not have control over the list. The New Jersey Department of Personnel certifies the list to Bayonne, ranking the applicants in order of their test scores. N.J. Stat. Ann. 11A:4-1; N.J.A.C. 4A:4-3.2. With limited exceptions not applicable here, Bayonne cannot choose from a "pool" of qualified candidates but

_____

17. In its brief, the NAACP argues that Bayonne would have hired police officers in 1996 from a list of eligibles that was over 30% African American if it had no residence requirement.

18. As we have noted, statistics often form the basis of the prima facie case in disparate impact cases. See Harrison, 940 F.2d at 798 (citations omitted). In Wards Cove, the Supreme Court emphasized that "the `proper comparison [is] between the racial composition of the [at-issue] jobs and the racial composition of the qualified ... population in the relevant labor market.' " 490 U.S. at 651 (citations omitted). The Court noted the possibility of using other statistics. See Id. at 651 ("Alternatively, in cases where such labor market statistics will be difficult if not impossible to ascertain, we have recognized that certain other statistics--such as measures indicating the racial composition of `otherwise qualified applicants' for at-issue jobs--are equally probative for this purpose."). And this court has looked to other statistics in disparate impact cases, see Green v. USX Corp., 896 F.2d 801, 805, but not when more probative statistics were available. The NAACP cites no authority, and we can find none, that supports the use of these particular statistics to set out a prima facie case of disparate impact discrimination under Title VII, particularly where the NAACP had available to it and made use of the labor market statistics that form the proper basis of a disparate impact case under Wards Cove. We express no opinion on whether under the appropriate circumstances such statistics can form the proper basis of a prima facie case under Title VII.

16

must hire the candidates presented by the New Jersey Department of Personnel according to rank. N.J.A.C. 4A:4-4.8. Bayonne cannot waive civil-service requirements for any applicant for a job governed by the civil service system. N.J.A.C. 4A:10-2.1. Significantly, when Bayonne removed the residency requirement, the number of African American candidates referred to it did not increase and even decreased. The NAACP acknowledges that African American representation on the certified list decreased. As noted, the record demonstrates that the number of African American candidates referred by the Department of Personnel to Bayonne for police positions decreased from 3.4% to 1% during the moratorium.[19]

The NAACP's second argument involves a comparison between the racial composition of what it asserts to be the labor market and the racial composition of Bayonne's workforce. While defining the relevant labor market precisely is usually necessary, we can also look to the general population of the Bayonne area if it is an adequate proxy.[20] See Wards Cove, 490 U.S. at 651 n.6 (citations omitted) ("[W]here `figures for the general population might . . . accurately reflect the pool of qualified job applicants,' we have even permitted plaintiffs to rest their prima facie cases on such statistics. . . .").[21] We found statistics on the general population sufficient to prove causation in Harrison,

_____

19. As we have noted, the parties have not provided us with similar comparative statistics for firefighters. According to the parties' joint appendix, however, from 1992-1995, of the 81 firefighters hired, 2 (2.5%) were African American. J.A. at 1.22-1.23.

20. The district court characterized the NAACP's definition of Bayonne's labor market as "speculative." As our analysis will show, we do not need to decide whether the NAACP properly defined the labor market.

21. We assume arguendo that the general population of the greater Bayonne area is the relevant labor market. But we note that looking to the general population is not necessarily sufficient in situations like this
one where the claim involves jobs with "special qualifications". See Hazelwood School Dist. v. United States, 433 U.S. 299, 307-308 (1977) ("When special qualifications are required tofill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.").

17

940 F.2d at 792, where the NAACP sued the Town of
Harrison claiming its residency requirement excluded
African Americans from municipal employment. The Town
of Harrison is similar to Bayonne -- it contains a low
percentage of African American residents, and it sits in
Hudson County. Following a bench trial, we upheld
judgment for the NAACP, citing with approval the district
court's reasoning:

> [t]he geographical areas from which Harrison draws
> employees includes its own County of Hudson as well
> as Bergen, Essex and Union counties. . . . It would be
> hard to conclude that among the very substantial
> number of black workers in the four county labor
> market there are not large numbers of persons
> qualified to serve as police officers, firefighters, clerk
> typists and laborers . . . . [W]here Harrison across the
> board has no black employees and where the total
> work force in [the four-county area] has at least
> 214,747 black persons, disparity is at least suggested.

Id. at 799.22

But there are important differences between Harrison and
this case. First, the statistical evidence in Harrison was
extremely probative. Before suit commenced, no African
American person had ever held a uniformed or non-
uniformed municipal position even though African
American representation among Harrison's private
employers was 22.1%. Harrison, 940 F.2d at 796.

Furthermore, the only evidence presented in Harrison
were projections based on statistics; here there is direct
evidence consisting of hiring percentages of African
American applicants during the four years in which
Bayonne removed its residency requirement. Statistics "are
not irrefutable; they come in infinite variety and, like any

_____

22. In Harrison, the court apparently did not consider the impact of the
civil service examination because the parties did not raise it. On appeal,
Harrison argued: (1) that the relevant labor market should be defined as
the entire State of New Jersey; and (2) that it had legitimate business
justifications sufficient to satisfy its burden under Title VII. Harrison
did
not dispute the accuracy of the plaintiffs' statistical analysis. See
Harrison, 940 F.2d at 799-800.

other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." International Bhd. of Teamsters v. United States, 431 U.S. 324, 340 (1977). In Title VII cases, we often rely on statistical evidence because direct evidence of the effect of a particular employment practice is not available. In Harrison, we concluded that the data presented indicated that among "the `vast black labor force in Harrison's labor market, there would be a large number of black persons qualified to serve and wishing to serve' in each category of municipal employment in Harrison." 940 F.2d at 889. In this case, no projection is necessary because there is direct evidence of the impact of the challenged employment practice. Under the 1991 stipulation, Bayonne removed the residency requirement for four years, and minority representation did not increase and even decreased for police officers. Faced with that record, we believe that the district court did not commit clear error in finding that the NAACP had failed to prove causation.

The NAACP contends we should not consider the results of the four-year moratorium and the evidence that the "bottom line" racial statistics did not improve, citing Connecticut v. Teal, 457 U.S. 440 (1982). But Teal did not hold that the "bottom line" is irrelevant; it held that an employer cannot avoid Title VII liability by manipulating the "bottom line" to compensate for racial discrimination in hiring or promotions. In Teal, employees of the Department of Income Maintenance of the State of Connecticut sued their employer, alleging that a promotion-eligibility examination was racially biased. The employer, in order to compensate for the low percentage of minority employees who passed the examination, selected a disproportionately high number of those minorities for promotion. The Court held the high minority promotion rate did not negate the discriminatory impact of the examination. "The suggestion that disparate impact should be measured only at the bottom line ignores the fact that Title VII guarantees these individual respondents the opportunity to compete equally with white workers on the basis of job-related criteria." Id. at 451.

Teal suggests that a subsequent affirmative action program cannot "redeem" discriminatory conduct that produces disparate results. See Id. at 452 ("respondents' claim of disparate impact from the examination, a pass-fail barrier to employment opportunity, states a prima facie case of employment discrimination under S 703(a)(2) despite their employer's nondiscriminatory `bottom line,' and that `bottom line' is no defense to this prima facie case under S 703(h)"). Here, the district court found no evidence of either disparate impact or racial discrimination. Furthermore, the NAACP presented no evidence that Bayonne manipulated the "bottom line" results of the four-year moratorium.

The NAACP's reading of Teal -- that we must ignore the bottom line -- is also inconsistent with Hazelwood and its progeny. Those cases appear to point to the "bottom line" to establish a prima facie case. Specifically, they state the "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified persons in the labor market." Wards Cove, 490 U.S. at 650 (citations omitted).

The plaintiff must, of course, do more than point to the "bottom line" to establish a prima facie case. The Supreme Court has held that a plaintiff must also prove causation. This was made clear when, seven years after Teal, the Supreme Court held:

> a Title VII plaintiff does not make out a case of disparate impact simply by showing that, `at the bottom line,' there is racial imbalance in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff 's prima facie case in a disparate-impact suit under Title VII.

Wards Cove, 490 U.S. at 657. The district court here concluded the NAACP's statistical evidence failed to prove how reinstituting the residency requirement would cause a decrease in minority representation.

20

In finding that the NAACP failed to show causation, the district court speculated that the civil service examination may be the cause of Bayonne's low hiring rate of African Americans. The court noted: "much is made of a 1996 police employment examination, which has a small number of persons of . . . the black race, as being qualified, but that list was not prepared or administered, nor reviewed by the defendant." The NAACP itself acknowledged to the district court: "When the residency requirement was lifted, [black applicants] were knocked out by the [police] exam. We believe this also occurred in the fire exam. . . . The test is administered by the Department of Personnel. We are not asking the Court to do anything about the test." J.A. at 1.66.

The district court found the NAACP failed to furnish evidence of a causal relationship between the residency requirement and the disparity in hiring. As we have discussed, the evidence presented -- that the percentage of African American municipal employees did not increase during the four-year moratorium and even decreased for police officers -- indicates that the district court did not commit clear error when it found insufficient evidence of causation. See Vulcan, 832 F.2d at 816 (finding district court did not commit clear error when it found statistical evidence flawed and unconvincing).

IV.

As we have noted, Bayonne hires employees for both competitive and non-competitive jobs. The district court focused its analysis almost entirely on hiring for competitive jobs. In granting Bayonne's Rule 52 motion, the court pointed to the civil service examination as the probable cause of the alleged disparity and noted that the examination is administered by the New Jersey Department of Personnel, not Bayonne.23

_____

23. The court noted the test "was prepared by the New Jersey Department of Personnel, so to try to speak of visiting discrimination, whether intentionally or inadvertently or institutionally, at the doorstep of the municipality is not warranted factually, and that is why I dismiss this case, because there is nothing to support it factually."

21

But Bayonne hires candidates for the non-competitive jobs, like laborer and clerk typist, directly and appears to have complete control over the process. Candidates for these jobs do not have to take and pass the New Jersey civil service examination. Furthermore, the residency requirement for these positions was merely relaxed so that non-residents who were hired had to move into Bayonne within six months of their hiring. The district court made no separate finding as to what impact, if any, this had on Bayonne's hiring of African Americans and what impact the reinstitution of that requirement has had on opportunities for African Americans to work for Bayonne in non-competitive jobs.

Under Rule 52(a), the district court shall makefindings of fact. Although there is some evidence on the record whether Bayonne discriminates in hiring non-competitive employees, the district court made no findings. On this record, we are unable to determine whether the NAACP has established a prima facie case of discrimination under Title VII in the City's hiring of non-competitive employees. We will remand this matter to the district court.

V.

For the foregoing reasons, we will affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

22